[See note to Case No. 11,404.]

## Case No. 11,403.

### PREVOST v. GORRELL.

[3 Wkly. Notes Cas. 548; 24 Pittsb. Leg. J. 143.]

Circuit Court, E. D. Pennsylvania. April 7, 1877.

TRANSFER OF CAUSE FOR TRIAL — CONVENIENCE OF PARTY AND WITNESSES—INSUFFICIENT GROUNDS FOR REMOVAL.

Petition by defendant to remove cause from Pittsburgh, in the Western district of Pennsylvania, to Williamsport, in the same district.

The petition set forth that the suit was case for damages done to the plaintiff's colliery in Columbia county; that this suit was brought for the same cause of action as in the case of Prevost v. Gorrell, originally brought in common pleas No. 2 of Philadelphia county (reported in 2 Wkly. Notes Cas. 440), the latter action having been held by the supreme court of Pennsylvania to have been a local action, and therefore wrongly brought in the common pleas of Philadelphia county (reported 3 Wkly. Notes Cas. 366); that the trial of said cause had occupied several weeks, and that this would probably occupy an equal time; that the witnesses resided in Columbia county, and that it would be burdensome to the defendant and to his witnesses to take them to Pittsburgh, when the case might as readily be tried in Williamsport, which was more than a hundred miles nearer the residence of all parties interested.

H. M. Shick, for the petition.
A. Sydney Biddle, contra.

[See note to Case No. 11,404.]

## Case No. 11,404.

### PREVOST v. GORRELL.

[5 Wkly. Notes Cas. 149.]

Circuit Court, E. D. Pennsylvania. Aug. 18, 1877.

DRAINAGE OF MINES — ADJACENT COLLIERIES — DRAINAGE FROM ONE MINE TO ANOTHER —EASEMENTS—MEASURE OF DAMAGES.

[1. Where two adjacent coal mines were held under lease, and water flowed from one into the other through an opening wrongfully made by a prior lessee of the latter, held that the lessee of the former was nevertheless liable for damages resulting from the flow of all water escaping by reason of unskillful mining; from overflow from accumulations, due to insufficient pumping capacity; from overflow of water artificially conveyed from one part of the mine to another, and then permitted to escape; and for overflow of surface water entering the mine because of badly constructed surface ditches.]

[2. Under such circumstances it was the duty of defendant to provide pumping capacity sufficient to prevent the overflow from his mine, not only of the ordinary and usual drainage, but also the flow occasioned by heavy and continued rains and melting snow, which by their well-understood periodical occurrence might be anticipated.]

[3. The fact that a mine has been trespassed upon by a previous lessee of a subjacent mine who took away the wall between them, does not justify the owner of the upper mine in discharging water through the opening, if by reasonable means he can discharge it from his own mine in some other way.]

[4. The lessee of a subjacent mine cannot complain of the mere natural flow from an upper mine through an opening wrongfully made by a previous lessee of the lower mine. But the owner of the upper mine cannot conduct his operations in entire disregard of the effect of his mode of operation upon the lower mine, and he is bound to provide appropriate and reasona-

ble means to prevent the injurious escape of wa-ter into it.]

[5. In determining the damages recoverable for wrongfully permitting water to flow from one mine to another there should be included a loss of legitimate earnings, which plaintiff was prevented from making by the wrongful acts of the defendant, provided such loss of earnings is clearly proved.]

Rule for new trial.

Mr. Bailey (with him Bryson, Schick & Spinney, James Ryon, and John W. Ryon), for the rule.

A. S. Biddle, Bartholomew & Hughes, and G. W. Biddle, contra.

BY THE COURT. Trespass on the case for injuries to the plaintiff's business as a coal operator, through the defendant's alleged wilful and negligent acts in causing water to flow from his mine into the plaintiff's through a connection between the two collieries, which adjoined each other, which connection had been made prior to the plaintiff's occupation. [The case was first heard upon defendant's motion to remove cause to Williamsport for trial. Motion denied. Case No. 11,403.] The evidence showed that the plaintiff and the defendant were lessees of adjoining collieries under a common landlord; the plaintiff's lease being of the Centralia colliery, and dating from 1873; the defendant's being of the Hazel Dell colliery, and dating from 1870. The workings of the collieries had been joined in 1871 by the trespasses of one Freck, the prior lessee of Centralia, across the line of his lease, and upon the colliery of the defendant. The lower gangway of Centralia being lower than that of Hazel Dell, the flow of water was from the latter to the former colliery. Much evidence was given as to the defendant's having taken advantage of the connection to rid his mine of water by causing it to pass over to Centralia. Evidence was also given of the insufficiency of his pumping apparatus. The plaintiff gave evidence of the profits he would have made, but for the defendant's illegal acts, on the coal he mined, and also on what he was prevented from mining by the defendant's default. The situation of the two collieries is shown by the plan in Locust Mountain Coal & Iron Co. v. Freck, 1 Wkly. Notes Cas. 124.

The plaintiff, in his points, asked the court to charge: That the defendant was not responsible for the natural flow of water from his (defendant's) colliery upon the plaintiff's, which flow would have taken place through the connection between the collieries, provided the defendant had continued to mine in a skilful and workmanlike manner, but that the defendant was responsible for the results of the flow of his drainage upon the plaintiff's colliery to the extent and in the manner following, viz.: (1) For such of the drainage of the defendant's colliery as was made to flow upon the plaintiff's colliery by the use of artificial contrivances which would not have been resorted to by the defendant in the course of good and skilful mining. (2) For such of the drainage of the defendant's colliery as overflowed into the plaintiff's colliery after rising in a pool to a certain height in the defendant's colliery, provided such accumulation and overflow of water in the defendant's colliery was occasioned by the defendant's insufficient pumping capacity and bad mining. (3) For such of the defendant's drainage as he artificially conveyed from one part of his colliery to another, and thence permitted to escape upon the plaintiff's colliery; as to which last water the defendant was not exempted from responsibility by any inadequate effort or insufficient means which he might have taken to prevent the result. (4) For such of the surface water, as was introduced into the defendant's colliery by reason of badly constructed ditches upon the surface, under the defendant's control, and for which he was responsible, and was thence permitted to flow into the plaintiff's colliery, and which, if the defendant's pumping capacity had been sufficient for the requirements of skilful mining upon his part, would have been removed by him through his pumps without injury to the plaintiff. Further, that the measure of damages was the loss sustained by the plaintiff through the defendant's wrongful acts, including loss of the legitimate earnings of his business as a coal operator during the period in question, of which the jury found he had been directly deprived by the wrongful acts of the defendant, provided such loss of earnings was clearly proved. All the points containing the above propositions were affirmed.

The defendant requested the court to charge, inter alia:

(1) That under his lease he had a right to mine out all the coal therein demised by such method of good mining as he could have pursued if no connection had existed between the two collieries, and that he was not bound to change such mode of mining in consequence of the trespasses by the predecessor in occupation of the plaintiff's colliery which had resulted in the connection between the mines, especially if such change would increase the expense of mining and cause a loss of coal. Answer: The defendant undoubtedly had the right to take out all the coal within the boundaries of his lease, subject only to the requirements of skilful and careful mining; but if, by reason of the trespass of the lessee of the adjoining mine, a connection between it and his mine became practicable within the boundaries of the latter, and he made such opening, he would not be absolved from the duty of reasonable precaution against avoidable injury to such adjoining mine.

(2) That though the necessary consequence of the defendant's mining was to increase the natural flow of water towards the connection

between the mines, and through such connection, into the plaintiff's mine, and thus damage was occasioned to the plaintiff, if this method of working was simply consistent with the reasonable exercise of the defendant's own rights and sprang from no malice towards the plaintiff, the plaintiff could not maintain an action for any damage occasioned thereby. Affirmed.

(3) That the defendant was not bound to have pumping capacity sufficient to provide for more than the ordinary and usual drainage of his colliery; and that if, in cases of sudden and violent rains, a large quantity of water first accumulated in the defendant's colliery beyond the power of his pumping capacity, and thence escaped through the opening into the plaintiff's colliery, the plaintiff could not recover for the damage occasioned thereby. Answer: The duty of the defendant, as to the measure of his pumping capacity, is not limited to the ordinary flow of water assumed in this point. It extends also to the flow occasioned by heavy and continued rains and melting snow, which, by their well-understood periodical recurrence, may be anticipated. These are comprehended in the ordinary flow for which the defendant was bound to provide.

(4) That the plaintiff could not recover for profits which he might have made, but for the injuries occasioned by the defendant's unlawful acts, such profits being of a speculative nature, uncertain, contingent, and too remote. Answer: In cases founded upon tort, a tort feasor is liable for the whole loss resulting directly from his unlawful acts. He is therefore liable for loss of such profits as are a matter of computation and susceptible of definite ascertainment. In this case these are to be measured by the difference between the cost of mining and preparing coal for the market and the market price of the coal when prepared and ready for delivery, and upon such quantity as the plaintiff has satisfactorily shown to the jury he was provided with the necessary means and facilities to mine and prepare for market, and that he could ship and sell.

(5) That if Freck, the predecessor in occupation of the plaintiff's colliery, by driving his gangway upon a lower level than the gangway in the defendant's colliery, and cutting openings across his line, made the plaintiff's colliery a servient or subjacent tenement, he thereby subjected the same to the flow of all the water, which by nature rose in or flowed upon the defendant's colliery, which last colliery was, as to the plaintiff's, a dominant or superior tenement. Answer: Agnew, J., in the case of the Locust Mountain Coal & Iron Co. v. Gorrell (March 29, 1872) 29 Leg. Int. 101, as an accurate exposition of the law applicable to the facts here, stated, viz.: "When, therefore, as in the present case, the miner in the upper mine, in carrying forward his gangway, strikes into a breast which has been wrongfully worked by a trespasser up the dip of his coal vein, he is

not justified in emptying the water flowing down the drain or gutter of his gangway into the opening thus struck, if by reasonable means he can carry the water across the drain into the gutter or drain leading into his own sump. * * * Good mining requires the owner of every mine to ditch his gangway and lead off the water gathering in it to his own sump, and thus to clear his mine of its enemy. There is no good reason, therefore, why the owner of the upper mine should suffer the flow of his gangway to run down upon the lower mine, when by reasonable diligence he can prevent it."

(6) That the defendant owed no duty to the subjacent (plaintiff's) colliery; that he had a clear right to mine out all his coal down to his lower gangway, and the plaintiff was bound to receive the natural flow of water from the defendant's colliery through the openings mentioned in the preceding point, or protect himself against it by leaving a sufficient pillar to prevent such flow. This rule is not modified by the mining of coal in the defendant's colliery, and the consequent subsidence of the surface at the outcrop of the vein. Answer: The defendant had a right to mine out all his coal to his lower gangway, but not in disregard of the effect of his mode of operating upon the subjacent mine. The operator of such mine cannot complain of the mere natural flow of water from the upper mine. Here again I adopt the language of Agnew, J., in the case before referred to: "When water, following the law of gravitation, after the removal of the coal in a careful and proper manner, finds its way by percolation, or through fissures unforeseen and unknown, into the lower mine, its owner cannot complain of it as an injury done by the owner of the upper mine. * * * I incline to think also that openings made before by a trespasser from the lower into the upper mine, and unexpectedly struck by the upper owner in mining, do not differ from natural fissures in the effect produced upon the lower mine." Beyond this natural flow the defendant was not absolved by the facts stated from the duty of providing appropriate, reasonable means to prevent the injurious inflow of water into the adjoining mine. The verdict was for the plaintiff for $128,808.41. This rule for a new trial was thereupon taken for the defendant.

Eo die. Rule discharged.

(See Thomas Iron Co. v. Allentown Mining Co., 28 N. J. Eq. 77, and cases cited in the reporter's note. And see Prevost v. Gorrell, [Case No. 11,400].)

[NOTE. Subsequently a motion for an order to the clerk to issue an attachment in execution was allowed. Case No. 11,400. The marshal of the Western district of Pennsylvania was directed to levy upon the property in that district, and the same writ was then handed to the marshal of the Eastern district, with directions that he should seize under it the property in that district. The marshal of that district then applied to the court for instructions as to whether he had authority to levy under the writ directed to the

marshal of the Western district, or whether an independent writ issued from the Western district directed to himself was necessary. The court held that the direction of the writ to one marshal was merely formal, and of no consequence. Case No. 11,402. Being unable to satisfy his judgment by execution at law, the plaintiff filed suits on the chancery side in aid of the execution against the defendant and others, to whom it was charged that the defendant had made conveyances of real estate for the purpose of hindering the plaintiff in the collection of his judgment. Demurrers to the bills in two of these cases were overruled. Cases Nos. 11,405 and 11,408. For a motion by one of the witnesses in this suit to be excused from appearing before an examiner for the purpose of being examined, see Case No. 11,405a.]